1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

GARY FALLIS,

                  Plaintiff,

     v.

OFFICER RON SASAKI, et al.,

              Defendants.

CASE NO. C09-5730BHS

ORDER GRANTING IN PART
AND RESERVING IN PART
DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT;
GRANTING IN PART AND
RESERVING IN PART
OFFICER HARDESTY'S
MOTION FOR PARTIAL
SUMMARY JUDGMENT AND
TO JOIN CO-DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT; AND DENYING
OFFICER SASAKI'S MOTION
FOR PROTECTIVE ORDER

       This matter comes before the Court on the moving Defendants' motion for

summary judgment (Dkt. 20), Officer Theron Hardesty's ("Officer Hardesty") motion for

partial summary judgment and to join his co-Defendants' motion for summary judgment

(Dkt. 31), and Officer Ron Sasaki's ("Officer Sasaki") motion for protective order (Dkt.

39). The Court has considered the pleadings filed in support of and in opposition to the

motions and the remainder of the file and hereby grants in part and reserves in part

Defendants' motion for summary judgment (Dkt. 20), grants in part and reserves in part

Officer Hardesty's motion (Dkt. 31), and denies Officer Sasaki's motion (Dkt. 39) for the

reasons discussed herein.

# I. PROCEDURAL HISTORY

On October 28, 2010, Defendants moved for summary judgment against Plaintiff on all claims against the individual Defendants. Dkt. 20.[1] On November 15, 2010, Plaintiff ("Fallis") responded in opposition to the motion for summary judgment. Dkt. 34. On November 19, 2010, Defendants replied. Dkt. 35. The Court renoted Defendants' motion to be considered on December 3, 2010.

On November 4, 2010, Officer Hardesty  moved for partial summary judgment (Dkt. 31) and to join in the other co-Defendants' motion for summary judgment (Dkt. 20). On November 29, 2010, Fallis responded in opposition to the motion. Dkt. 37. On December 3, 2010, Officer Hardesty replied. Dkt. 41.

Additionally, on December 2, 2010, Officer Sasaki moved for a protective order staying deposition testimony until the qualified immunity issues are determined. Dkt. 39. On December 6, 2010, Fallis responded in opposition to this motion. Dkt. 43. On December 10, 2010, Officer Sasaki replied. Dkt. 44.

# II. FACTUAL BACKGROUND

This case arises out of criminal charges brought against Fallis alleging that he violated a protective order imposed against him to protect his wife, Erica Fallis, and, in doing so, committed malicious mischief through property damage. He was acquitted in a criminal trial on the charges and now brings this civil action against the named Defendants.

The events in this matter involve officers and police departments from Bonney Lake Police Department ("BLPD"), the Sumner Police Department ("SPD"), and the

---

[1]The municipal defendants named in this suit (the officers' respective police departments and/or the city in which they operate) did not join in this motion. The discussion herein is limited to the individual defendants named in this lawsuit.

Pierce County Sheriff's Department ("PCSD"). *See, e.g.,* Dkt. 1, Attachment 3 (Complaint).

In May 2006 a Pierce County Superior Court issued a domestic violence protection order against Fallis, which ordered him to vacate the family home and prohibiting him from having any contact with Erica Fallis or their Bonney Lake property. *See, e.g.,* Declaration of Officer Sasaki ("Sasaki Decl.), Ex. A (copy of protective order); Declaration of BLPD Officer Marcus Kohen (Kohen Decl.) ¶ 3 (Officer Kohen served the order on Fallis).[2] This order was made permanent on May 26, 2006. *See, e.g., id.* Between May 18, 2006 and September 31, 2006, Fallis' wife reported eight violations of the protective order; Fallis was cited on two of those occasions. Sasaki Decl. ¶ 4 (discussing Sasaki's extensive knowledge of Fallis' domestic issues with his wife).

In the late evening of October 1, 2006, Erica Fallis (Fallis' wife) phoned the BLPD to report that Fallis had violated the protective order by entering her property and damaging a truck registered to her guest, Tom Allen ("Allen"). Dkt. 30 at 15 (transcript, Officer Sasaki testifying in Fallis' criminal trial). Although Erica Fallis was at work and did not witness Fallis vandalize the truck, as a result of this phone report, Officer Sasaki went to the Fallis residence to investigate the matter. *Id.* at 16.

At the residence, Officer Sasaki contacted Allen, who was at the Fallis residence and claimed to have witnessed the alleged felonious act. *Id.* Allen reported the truck had been vandalized and identified Fallis as the suspect. *See id.* at 17. Officer Sasaki took pictures of the damage to Allen's vehicle and estimated the damage to be around $2600, based on his personal and professional experience. *See, e.g., id; see also* Sasaki Decl., Ex. B at 4 (incident report).

---

[2]At all relevant times, no facts suggest that Officer Koehn was a part of the onsite arrest of Fallis. *See, e.g.,* Dkt. 34-4 at 29. However, after the arrest, he transported Fallis to the hospital.

After the onsite investigation, Allen brought a written statement to the police station around 11:30 p.m. the same night, which stated that Fallis, the initial suspect, may be staying nearby at the Sumner Motor Inn. *Id.* Based on this information, SPD Officer John Kaylor ("Officer Kaylor") was dispatched to the Sumner Motor Inn to determine if Fallis and/or his vehicle were on site. *Id.* at 30 (transcript, testimony of Officer Kaylor). Once there, Officer Kaylor located what was believed to be Fallis' truck, ran the plate, and obtained a positive match. *Id.* Officer Kaylor then phoned the front desk of the Sumner Motor Inn to inquire as to whether Fallis was indeed staying at the inn. *Id.* Officer Kaylor contends that the front desk manager, Patricia Hilliker ("Hilliker"), was uncooperative. *See, e.g., id.* at 30-31. After some discussion, Officer Kaylor provided Hilliker with his name and badge number and asked her to verify with the 911 dispatch that he was indeed an officer with the SPD. *Id.* at 31.

A few minutes later, Officer Kaylor observed a person matching Fallis' description exiting a hotel room and fleeing on foot. Officer Kaylor believed this person to be Fallis and activated his headlights and then his police lights. Fallis did not stop and, as a result, Officer Kaylor gave chase on foot. *Id.* Officer Kaylor, unable to locate and apprehend Fallis, awaited backup.

Officer Sasaki and several other BLPD officers arrived on the scene as backup for Officer Kaylor. Officer Sasaki made in-person contact with Officer Kaylor and, after discussing the events, determined that the suspect was Fallis. Dkt. 34-4 at 10. Officer Sasaki, with the aid of several BLPD units, set up a containment perimeter of approximately three blocks around the area where Fallis might be hiding or continuing his flight. *See, e.g., id.*; Dkt. 34-4 at 68.

After the containment perimeter was set up, Officer Kaylor and BLPD Officer G.L. Backus ("Backus") went to see Hilliker inside the Sumner Motor Inn. Dkt. 34-4 at 68 (Ex. N., Officer Kaylor's police report). Hilliker confirmed she had informed Fallis of

the presence of Officer Kaylor. *See id.* at 32; *see also* Dkt. 34-4 at 62 (Ex. M, testimony of Hilliker, the manager on duty). Hilliker also confirmed that Fallis was staying in Room 201, which is the room Officer Kaylor saw Fallis exit from. *See id.* at 32; *see also* Sasaki Decl. ¶ 9.

Also following the set up of the containment perimeter, Officer Sasaki requested K-9 support from Pierce County. Officer Hardesty arrived with his canine partner, Cliff, to supply K-9 support. Officer Sasaki advised Officer Hardesty of the situation. Officer Sasaki and Officer Hardesty decided it was appropriate to deploy Cliff to track and locate Fallis, if possible. Officer Hardesty began to track Fallis with the help of Officers John Ford ("Officer Ford") and Kaylor. Sasaki Decl. ¶¶ 7, 11; Dkt. 34-4 at 10; Dkt. 34-4 at 24 (testimony of Officer Ford); Dkt. 34-4 at 68 (Officer Kaylor police report). Officer Sasaki did not accompany Officer Hardesty while he and his canine tracked Fallis. *See, e.g., id.*

During the track, Cliff contacted Fallis by biting his leg and bringing him to the ground out of the bushes wherein he had been hiding from the officers. *See, e.g., id.* Officer Hardesty claims that he commanded Cliff to release once Fallis' hands were in view, after which Officer Kaylor was able to handcuff Fallis. *See, e.g., id.*

Officers Kaylor, Hardesty, and Ford walked Fallis back to where some of the police vehicles and Officer Koehn were located. Absent from the record is any evidence that these officers knew or had reason to know that Fallis' leg was actually broken as a result of Cliff's bites; the officers would only have had reason to know that Fallis' leg had been bitten several times. After escorting back he was contacted by Officer Koehn who recognized Fallis from previous contacts; Fallis also identified himself. Thereafter, the officers checked Fallis for health and welfare before transporting him to the Pierce County Jail. *Id.* at 18.

A criminal action was brought against Fallis. On October 3, 2006, a Pierce County Judge found probable cause and set bail at $200,000. Dkt. 30-1 at 28 (bail order). The

1    Pierce County prosecuting attorney filed felony criminal charges against Fallis for

2    malicious mischief in violation of RCW 9A.48.070(1)(a) (the statute then reading "did

3    unlawfully, feloniously, knowingly, and maliciously cause physical damage in excess of

4    $1500 to a motor vehicle). *Id*. at 32. A jury acquitted Fallis.

5        Following his acquittal, Fallis brought this civil action alleging the following

6    federal causes of action: (a) nine claims against different groupings of Defendants for

7    arrest without probable cause under 42 U.S.C. § 1983; and (b) three claims against

8    different groupings of Defendants for excessive force in violation of 42 U.S.C. § 1983.

9    Fallis also asserts the following state law claims: (a) six claims against different

10   groupings of Defendants for false arrest; (b) six claims against different groupings of

11   Defendants for negligent excessive force; and (c) six claims against different groupings of

12   Defendants for negligent infliction of emotional distress; (d) four claims against the

13   separate municipal entities for negligent hiring, training, and supervision; and (e) a strict

14   liability claim against Pierce County for violating RCW 16.08.040 (dog bite statute).

15   

16                              **III. DISCUSSION**

17   **A.    Summary Judgment Standard**

18       Summary judgment is proper only if the pleadings, the discovery and disclosure

19   materials on file, and any affidavits show that there is no genuine issue as to any material

20   fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

21   The moving party is entitled to judgment as a matter of law when the nonmoving party

22   fails to make a sufficient showing on an essential element of a claim in the case on which

23   the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

24   (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

25   could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

26   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

27   present specific, significant probative evidence, not simply "some metaphysical doubt").

28

*See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

   The determination of the existence of a material fact is often a close question.  The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson,* 477 U.S. at 255).  Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.** **Disputed Facts**

   To begin with, Fallis' complaint relates a wholly different version of the facts than that which was described above. In his complaint, he contends that he was visiting a friend at the Sumner Motor Inn and while walking to his truck he was attacked by a German Shepard dog that bit his ankle. These alleged facts are not believable given the overwhelming evidence to the contrary. Complaint ¶ 21. Indeed, Fallis conceded at his criminal trial (occurring more than two years prior to this case being filed) that Cliff contacted him whilst he hid in the bushes in the backyard of a private residence, which he fled to after being informed by Hilliker that law enforcement was looking for him at the Sumner Motor Inn. *See* Dkt. 30 at 57-59 (Fallis' testimony, trial transcript).

Plaintiff's briefing on summary judgment abandons the parking lot bite story and, instead, argues that questions of fact exist as to the federal and state law claims in a manner consistent with the facts as represented by Defendants. *See* Dkt. 34. Thus, unless stated otherwise, the Court adopts the uncontroverted version of the facts that is consistent with those set forth by Defendants and that are relevant to the instant motions. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

**C.   Officer Hardesty's Summary Judgment Motion**

Officer Hardesty moves the Court to permit his joinder in the co-Defendants' motion for summary judgment. Dkt. 31[3] (referring to Defendants' motion, Dkt. 20). Officer Hardesty was the K-9 dog handler in this matter. Officer Hardesty, however, does not join in the excessive force § 1983 claim, at this time. Dkt. 31 at 2. Officer Hardesty seeks immunity as to liability attributable to him as the dog handler under RCW 4.24.410.

**1.   Dog Handler Immunity**

The Court reserves ruling on this issue. Hardesty may renew this portion of his summary judgment motion in his planned full summary judgment motion.

**2.   Extension of Time, Rule 56(f)**

Fallis also asserts that Officer Hardesty's motion is premature and that more discovery is needed. Fallis did not file a Fed. R. Civ. P. 56(f) motion to continue the pending summary judgment motions. Even if the Court construed Fallis' opposition to

---

[3]Although, Dkt. 31 alerts the Court that Paul Pastor and Pierce County have filed the motion for partial summary judgment and to join the other co-Defendants' motion for summary judgment (Dkt. 2), the actual brief only references Officer Hardesty as the moving party. Thus, the Court limits the motion (Dkt. 31) to Officer Hardesty.

ORDER - 8

Officer Hardesty's motion for summary judgment as containing a Rule 56(f) motion,

Fallis has not met the standards for obtaining such a continuance:

> References in memoranda and declarations to a need for discovery do not qualify as motions under Rule 56(f). Rule 56(f) requires affidavits setting forth the *particular* facts expected from the movant's discovery. Failure to comply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judmgent.

*Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986) (emphasis

added).

Here, Fallis asserts nothing more than speculation that additional discovery will be

relevant to the issues before the Court. No specific facts are identified as to what he hopes

to discover that would necessitate such an extension of time. Additionally, Officer

Hardesty filed this motion and pointed out these hurdles to Fallis two months ago, and

Fallis has still not filed a Rule 56(f) motion.

Based on the foregoing, the Court finds no adequate reason to deny Officer

Hardesty's motion for partial summary judgment and to join his co-Defendants' motion

for summary judgment (Dkt. 20). Because Fallis has not complied with Rule 56(f) and

has not shown he could meet the burden to obtain a continuance, the Court declines

Fallis' request for an extension of time before considering the instant motions.

### 3.    Conclusion

Therefore, while the Court reserves ruling on Hardesty's state-law immunity

argument under Washington's dog handler statute, the Court grants Hardesty's motion to

join his co-Defendant's motion as discussed herein. For convenience, the Court will refer

to each of the individual Defendants collectively as "Defendants," unless otherwise

stated. The Court will also refer to only one motion for summary judgment (Dkt. 20), as

Officer Hardesty is now joined in that motion to the extent requested.

1

**D.      Dismissal of Claims Against Some Defendants**

2

3       Defendants' motion for summary judgment is brought on behalf of individual

4  defendants, not the municipal entities that they work for (i.e., BLPD, SPD, PCSD). The

   discussion herein pertains only to the individual Defendants.

5

6       Defendants move to dismiss Officers Vance, Vansickle, Backus, Koehn, and Ford.

7  *See* Dkt. 31. Defendants make this motion on the basis that these officers did not have a

8  role in the events in question that could give rise to individual liability. *See id.* In Fallis'

9  brief in opposition (Dkt. 34), he does not adequately address the involvement of these

10 officers, except for Officer Ford.

11      Specifically, Fallis fails to point to evidence that these officers, except Officer

12 Ford, had any individual role in the case that would give rise to liability for excessive

13 force.[4] The facts, taken in the light most favorable to Fallis, establish that Officer Sasaki

14 requested K-9 support and that Officers Hardesty, Kaylor, and Ford were involved in the

15 tracking of Fallis using Cliff, see above. Therefore, any claims of excessive force against

16 Officers Vance, Vansickle, Backus, and Koehn are dismissed.

17      Defendants also move to dismiss the claims against BLPD Chief Mike Mitchell

18 and former SPD Chief Colleen Wilson on the issue of supervisory liability. The Court

19 grants this motion as to the claims regarding probable cause.[5] However, the Court finds

20 the briefing by both parties on this issue otherwise inadequate to resolve the issue of

21 supervisory liability on the excessive force claim at this time. Therefore, this issue may be

22 addressed within a subsequent summary judgment motion on issues not addressed herein.

23

24

25

26      [4]The § 1983 probable cause issue is dismissed, discussed below; therefore, the focus of
   the individual Defendants on this issue revolves around the excessive force claim.

27
        [5]*See*  n. 7, above.
28

**E.      Defendants' Motion for Summary Judgment, Federal Claims**

Defendants argue that they have qualified immunity from Fallis' § 1983 claims. In reviewing a qualified immunity defense on a motion for summary judgment, the Court is "required to view all facts and draw all reasonable inferences in favor of the nonmoving party." *Brosseau v. Haugen*, 543 U.S. 194, 195 n. 2 (2004) (per curium); *see also Motley v. Parks*, 432 F.3d 1072, 1075 n. 1 (9th Cir. 2005) (en banc) (accepting plaintiffs' recitation of the facts because the case arose in the posture of a motion for summary judgment and involved issues of qualified immunity). The Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), established a two-part test to resolve claims of qualified immunity: (1) was there a constitutional violation and, if so, (2) whether the right was clearly established within the specific context of the case at hand. This analysis was later relaxed from what was once a rigid sequential test. *See Pearson v. Callahan*, 555 U.S. __, 129 S. Ct. 808 (2009) (giving the district court discretion as to which of the two *Saucier* factors to consider first). The Court finds this case amenable to the analytical sequence set out in *Saucier*.

**1.      Was a Constitutional Right Violated?**

**a.      Probable Cause**

Fallis alleges that Defendants violated his constitutional rights when the officers made a warrantless arrest. Defendants do not dispute that Fallis was arrested without a warrant. Rather, Defendants allege they had probable cause to arrest Fallis without a warrant for allegedly violating a domestic violence protective order and causing damage to Allen's truck, the latter of which constitutes a felony under former RCW 9A.48.070(1)(a) (the statute then reading "did unlawfully, feloniously, knowingly, and maliciously cause physical damage in excess of $1500 to a motor vehicle).[6]

---

[6]Fallis attempts to argue that the amount of damage must be $5000; however, this is based on the revised RCW 9A.48.070(1)(a) and not the version in place when he was arrested.

Under Washington law, "[a] police officer having probable cause to believe that a person has committed or is committing a felony shall have the authority to arrest the person without a warrant." RCW 10.31.100 ("arrest without warrant"). Further, RCW 26.50.110(2) provides that "a peace officer *shall arrest without a warrant* and take into custody a person whom the peace officer has probable cause to believe has violated an order" issued under RCW 26.50 (Domestic Violence Protection) (emphasis added).

Fallis urges the Court to find that probable cause did not exist at the time of his arrest. However, the facts he relies on to support such a proposition are facts learned after his arrest. *See* Dkt. 34 (Fallis asserts he was innocent, that he did not commit the alleged crimes, and that it was his wife who keyed Allen's truck). These facts are irrelevant. The issue presented here is whether the officers had probable cause to effect a warrantless arrest on Fallis on the night in question. That being the question, Fallis' arguments based on later discovered facts is unavailing. Although Fallis asserts that Allen's story was incredible due to his criminal history, given the totality of the circumstances, the officers had no reason to doubt the information they relied on in arresting Fallis. The officers followed up on a report from Erica Fallis that was corroborated by Allen's report and the physical evidence of the truck, in addition to Fallis' flight when he learned of Officer Kaylor's presence at the Sumner Motor Inn. Fallis also fails to cite to adequate authority that would permit reliance on facts learned after the arrest to establish the lack of probable cause at the time of his arrest. The Supreme Court has held that "the probable cause inquiry is . . . confined to the known facts bearing upon the offence actually invoked at the time of the arrest" and that "whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Davenpeck v. Alford*, 543 U.S. 146, 153 (2004).

---

The Court rejects such argument.

The relevant facts known to the officers at the time of arrest were: Fallis was known by Officer Sasaki to have violated the protective order on at least two other occasions before the time discussed herein; and Allen's report seemed credible to the officers at the time the allegations were made, claiming that Fallis entered the property in violation of his court order and keyed Allen's truck causing more than $1500 worth of damage, a felony in Washington. Officer Sasaki went and investigated and confirmed the allegations at Erica Fallis' home where Allen's keyed truck was located. These uncontroverted facts establish probable cause alone. Even if that was not enough information to establish probable cause, Fallis' fleeing and hiding in a bush at a residence that was not his was also evidence the officers could have relied on in establishing probable cause to arrest: it appeared that Fallis knew he had violated the protection order and was eluding arrest.

These facts establish that the officers had probable cause to arrest Fallis. Here, the applicable statute on malicious mischief permits a warrantless arrest and the statute regarding violations of a domestic violence order require a warrantless arrest. Even in the case where officers mistakenly, but reasonably, conclude that probable cause exists, the officers are entitled to qualified immunity. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (officers immune from suit when acting in light of clearly established law based on information they possessed at the time of arrest). Applied here, Fallis has failed to establish a violation of his constitutional rights with respect to probable cause, and qualified immunity attaches to the Defendants for their arrest of Fallis.

Therefore, the Court grants summary judgment as to all Defendants because the officers had probable cause. The Court need not reach the second *Saucier* factor to determine whether a right was clearly established, as no violation occurred.

### b.   Excessive Force

For purposes of resolving Defendants' summary judgment motion on Fallis'
excessive force claim, the Court is concerned only with Officers Sasaki, Kaylor, and
Ford. This is because the other BLPD and SPD officers have been dismissed from this
case (see above) and because Officer Hardesty and the municipalities have not moved for
summary judgment on this issue at this time.

The Fourth Amendment protects an individual's right to be subjected only to force
that "is objectively reasonable under the circumstances." *Boyd v. Benton County*, 374
F.3d 773 (9th Cir. 2004). The factors in the reasonableness inquiry include: "[1] the
severity of the crime at issue, [2] whether the suspect poses an immediate threat to the
safety of the officers or others, and [3] whether he is actively resisting arrest or attempting
to evade arrest by flight." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en
banc) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "[A]n additional factor . . .
is the availability of alternative methods of capturing or subduing a suspect." *Id.* at 703.
This reasonableness determination requires balancing the "nature and quality of the
intrusion on the individual's Fourth Amendment interests against the countervailing
governmental interests at stake" from the "perspective of a reasonable officer on the
scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (internal
citation omitted). "The need for such balancing means that 'summary judgment . . . in
excessive force cases should be granted sparingly." *Boyd*, 374 F.3d at 779 (quoting
*Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (alternation in original).

The Court must first examine the quantum of force used against Plaintiff before
turning to the reasonableness of the force. *See Chew v. Gates*, 27 F.3d 1432, 1441 (9th
Cir. 1994) ("The three factors articulated in *Graham*, and other factors bearing on the
reasonableness of a particular application of force, are not to be considered in a vacuum

but only in relation to the amount of force used to effect a particular seizure – an analysis the district court never explicitly undertook.").

Two instances of force used in this case are challenged by Fallis: (1) the use of K-9 support that resulted in injury to Fallis' leg and (2) the walking of Fallis back to the police vehicles while his leg was injured as a result of K-9 efforts to locate Fallis. Viewing all the facts, the Court finds that Fallis has not established an excessive force claim as to the manner in which he was escorted back to the police vehicles following Cliff's contact. Thus, the Court turns to the issue of the amount of force used with respect to K-9 support in particular.

The amount of force used here was considerable. The deployment of Cliff to bite and hold Fallis resulted in multiple puncture wounds and a fractured leg. *See, e.g.,* Dkt. 34-4 at 48-50 (medical report noting that Fallis had greater than fifty punctures to his leg consistent with canine bite marks and an indentation fracture in his leg as a result of the bites). Additionally, testimony from the trial and the record before this Court tend to show that Cliff bit Fallis on the leg and proceeded to "yank" him out of hiding. Dkt. 34-4 at 19; *see also* Dkt. 34-4 at 43 (Ex. J, photograph depicting multiple bites and punctures to Fallis' leg). Accordingly, the Court views its *Graham* factor analysis in light of this considerable quantum of force.

### i.       The Threat to Officers and Others

Turning to the *Graham* factors, the Court first begins with the "most important single element of the three specified *Graham* factors: whether the suspect poses an immediate threat to the safety of the officers or others." *Chew*, 27 F.3d at 1441. Officers Kaylor, Ford, and Sasaki were presented with a situation wherein they needed to locate a suspect who, after fleeing, was believed to be fleeing and possibly hiding within the established perimeter. Fallis fled when he learned from Hilliker that Officer Kaylor was attempting to contact him at the Sumner Motor Inn. The officers did not know where or if

Fallis was hiding. Unlike the officers in *Chew*, the officers in this case did not have occasion to contact Fallis prior to his flight and determine that he posed no threat to their safety. While Officer Sasaki did not participate in the tracking of Fallis, Officers Kaylor and Ford did and were faced with attempting to locate a fleeing Fallis during the dark of night, and, at the time, the facts known to these officers did not suggest that the officers had a way to determine whether Fallis was armed or posed other threats to their individual safety or those of the residents who lived in the area where Fallis had fled.

The Court must take the facts in the light most favorable to Fallis. Accepting his version of the facts as true, and drawing all reasonable inferences in favor Plaintiff, this first factor weighs in favor of the Defendants.

### ii.        Severity of the Crime

The second factor under *Graham* is the consideration of the severity of the crime. The officers had probable cause to believe that Fallis had violated a domestic violence order and had committed malicious mischief. Under Washington law, the officers were required to arrest Fallis for the violation of a domestic violence protective order and permitted to do so for the felony of malicious mischief. In fact, in such instances, the government has a strong and undeniable, legitimate interest in apprehending such individuals. Thus, this factor weighs strongly in Defendants' favor. *See Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003) (concluding that such a strong interest exists). This factor weighs heavily in favor of Defendants.

### iii.        Resisting or Evading Arrest by Flight

The third factor under *Graham* is whether the individual actively resisted arrest or attempted to evade arrest by flight. Here, Fallis initially resisted arrest by fleeing the when Hilliker informed him as to Officer Kaylor's presence. Fallis did not stop when Officer Kaylor turned his headlights on and then made a show of authority with his police lights. Fallis argues that, like Chew, he simply hid and waited for the officers to make

contact, which would evidence that his flight ended when he proceeded to hide. However, unlike the facts in *Chew* where the officers knew Chew to be within the shipyard, the officers in this case only believed Fallis might be within the perimeter they had set up. The *Chew* court found this factor to weigh in favor of Chew because he had given up his flight to simply hide quietly in the shipyard. The same cannot be said for Fallis. Therefore, this factor weighs in favor of Defendants.

### iv.   Alternative Means of Capturing or Subduing Fallis

The Court may also consider the ability of alternative methods of capturing or subduing a suspect as part of the *Graham* analysis. *See Smith*, 394 F.3d at 703. Here, the officers elected to use canine support, apparently because it was dark out and they could not otherwise locate Fallis. Officer Kaylor had attempted to apprehend Fallis on foot but was unable to locate his whereabouts. Even Fallis admitted that he could not see the officers or the dog until he was contacted by Cliff because the bush in which he hid was too thick. However, while it appears that K-9 support may have been one of the few, if not the only effective means available, it is not readily determinable from the facts whether alternative means may have been more appropriate. Nonetheless, the question is of reasonableness, and Fallis has not established that the decision to use K-9 support was unreasonable. Indeed the facts suggest that the decision to deploy Officer Hardesty and Cliff was quite reasonable in light of the circumstances presented. It is a different matter as to whether the force actually exerted by Cliff was excessive; as discussed below, this issue remains open as to Officer Hardesty and the other parties not joining in the instant motion. Thus, considering the foregoing, this factor weighs slightly in Defendants' favor or is neutral.

### v.   Lack of Warning Before Releasing Canine

Fallis further contends that the officers violated his Fourth Amendment rights by not warning that Cliff might be released to bite him and bring him out from his hiding place. It is undisputed that a warning was not given in this instance. The Ninth Circuit has previously instructed that "the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." *Deorle v. Rutherford*, 272 F.3d 1272, 1274 (9th Cir. 2001). Here, Fallis has not established that a warning would even have been audible due to the officers not knowing where Fallis was hiding or fleeing to when they began the K-9 track. Further still, given that they could not determine, under the circumstances, whether Fallis was armed or unarmed when he began his flight, the officers' safety may have been compromised by giving a warning, thus disclosing their own location. The absence of a warning is neutral.

### vi.   Conclusion

The foregoing *Graham* factor analysis, taking the facts in the light most favorable to Fallis, leaves the Court to conclude that a rational jury could not decide that using Cliff to apprehend Fallis was unreasonable in this instance and, thereby, constituted excessive force under the Fourth Amendment. This conclusion pertains only to Officers Sasaki, Ford, and Kaylor, in addition to the other BLPD and SPD officers for whom no exposure to liability exists, see section D above.

A more narrow question to be answered, however, is whether Fallis was entitled to a warning before the canine was released to bite and hold him until he could be taken into custody. This answer requires the Court to determine whether such a right was clearly established at the time of this incident.

### 2.   Was the Right To Warn Clearly Established?

In a well-reasoned 2007 order, Judge Lasnik addressed the issue of whether a plaintiff is entitled to a right to warn before a police dog is used to apprehend him during

a criminal investigation. *Dickinson v. City of Kent*, 2007 WL1830744. Although the

plaintiff in *Dickinson* was not hiding when the police dog contacted him, the Court finds

the reasoning and analysis in *Dickinson* instructive to the resolution of similar facts and

issues in this case. Judge Lasnik discussed the issues as follows:

> The relevant, dispositive inquiry in determining whether a right is
> clearly established is whether it would be clear to a reasonable officer that
> his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S.
> at 202. "If the law did not put the officer on notice that his conduct would
> be clearly unlawful, summary judgment based on qualified immunity is
> appropriate." *Id.* "[A] victim's constitutional rights may be clearly
> established in the absence of a case 'on all fours prohibiting [the] particular
> manifestation unconstitutional conduct [at issue].'" *Boyd*, 374 F.3d at 781
> (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001)
> (alterations in original). "The Supreme Court has provided little guidance as
> to where courts should look to determine whether a right was clearly
> established at the time of the injury." *Id.* In the Ninth Circuit, the Court first
> looks to binding precedent by the Supreme Court or this Circuit to
> determine whether a right was clearly established. *Id.* In the absence of
> binding precedent, the Court is instructed to "'look to whatever decisional
> law is available to ascertain whether the law is clearly established' for
> qualified immunity purposes, 'including decisions of state courts, other
> circuits, and district courts.'" *Id.* (citing *Drummond v. City of Anaheim*, 343
> F.3d 1052, 1060 (9th Cir. 2003).   There is no Supreme Court authority
> specifically addressing whether a warning is required before releasing a
> police dog to bite. The Ninth Circuit has recently considered claims of
> excessive force by a police dogs in, among others, the following cases:
> *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003); *Brewer v. City of
> Napa*, 210 F.3d 1093 (9th Cir. 2000); *Watkins v. City of Oakland*, 145 F.3d
> 1087 (9th Cir.1998); *Vera Cruz v. City of Escondido*, 129 F.3d 659 (9th Cir.
> 1997); *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994); *Mendoza v. Block*, 27
> F.3d 1357 (9th Cir. 1994). In five of these cases, *Miller*, *Brewer*, *Watkins*,
> *Vera Cruz* and *Mendoza*, the police gave warnings before releasing the
> dogs. *See Miller*, 340 F.3d at 961 ("Deputy Bylsma yelled: 'This is the
> Sheriff's Office. You have five seconds to make yourself known, or a police
> dog will be sent to find you.'"); *Brewer*, 210 F.3d at 1094-95 ("Medlar
> drew his handgun and shouted a warning, informing the suspect that if he
> refused to surrender, a dog capable of biting would be released to locate
> him."); *Watkins*, 145 F.3d at 1090 ("Before releasing Nero to search for the
> person, Officer Chew announced twice: 'This is the Oakland Police
> Department canine unit.[7] Give yourself up or I'll release my dog who is
> going to find you and he is going to bite you."); *Vera Cruz*, 139 F.3d at 660
> ("When the officer identified himself, Vera Cruz began walking away.
> Distel then warned Vera Cruz to stop or he would release the dog; Vera
> Cruz started running. After giving another warning, Distel released the dog,

---

[7]For clarity, Officer Chew is not the same person as the Chew in *Chew v. Gates*.

ORDER - 19

who bit Vera Cruz on the right arm, bringing him to the ground."); *Mendoza*, 27 F.3d at 1358 ("A deputy testified that the helicopter made at least 20 such announcements [that a dog might be deployed]."). *In Chew, the Court did not mention whether a warning was given. However, Chew is distinguishable here because the case involved a concealed suspect. Furthermore, as discussed below, since 1991 cases from other circuits have clearly established that when a suspect is not hiding, a warning is required before a police dog is released to bite*. Because the Ninth Circuit has not expressly held that there is a right to a warning, the Court turns to the authority from other circuits.

In 1998, the Fourth Circuit in *Vathekan v. Prince George's County*, 154 F.3d 173 (4th Cir. 1998), held that "it was clearly established in 1995 that failing to give a verbal warning before deploying a police dog to seize someone is objectively unreasonable and a violation of the Fourth Amendment." *Id.* at 179 (citing *Kopf v. Wing*, 942 F.2d 265, 268 (4th Cir. 1991)). In 2003, the Eight Circuit, narrowed this broad pronouncement in the qualified immunity context by carving out an exception to the verbal warning requirement in cases where a suspect is hiding. *Kuha v. City of Minnetonka*, 365 F.3d 590 (8th Cir. 2004), *overruled on other grounds*, *Szabla v. City of Brooklyn Park*, 2007 U.S. App. Lexis 11602, *27 (8th Cir. May 18, 2007) (en banc) ("abandoning" Part II. C of Kuha as circuit precedent). However, while the Eight Circuit's holding in Kuha means a failure to warn in all cases is not per se objectively unreasonable, the Eighth Circuit followed the Fourth Circuit's holdings in *Vathekan* and *Kopf* that when a suspect is not concealed, a failure to warn is objectively unreasonable.

*Vathekan* involved the release of a police dog into a house whereafter the dog found, bit, and seriously injured a sleeping woman. In an earlier Fourth Circuit case, *Kopf v. Wing*, 942 F.2d 265 (4th Cir. 1991), the court concluded that releasing a police dog, without warning, into an extremely narrow passage between a shed and a fence, where the suspects were essentially trapped, could be deemed objectively unreasonable. While the Court agrees with the general holding in both these cases, they do not clearly establish that a verbal warning is always required. An officer could conclude, that in situations where the location of a suspect is less evident, a warning would place the officers at undue risk from a hiding suspect.

*Dickinson*, 2007 WL 1830744 at *6-7 (emphasis added, footnotes omitted). While Fallis contends *Chew* requires a right to warn in this instance, the Court rejects this position because the foregoing analysis establishes that the law is not clear regarding suspects, who like Fallis, are concealed when contacted by a canine during an arrest.

The Court adopts the foregoing well-reasoned opinion of Judge Lasnik and concludes that, at the time of Fallis' arrest, no right to warn of Cliff's use had been

clearly established at the time of this incident. The officers are entitled to qualified immunity from suit on the narrow issue of failure to warn.

Therefore, the Court grants summary judgment on this narrower § 1983 excessive force issue in favor of Defendants.

**F.    Duty to Intervene**

Fallis asserts that the BLPD and SPD officers had a duty to intervene and prevent Cliff from biting him. In opposition, Defendants recognize that such a duty can exist but that it does not apply in this case. This issue pertains only to Officers Sasaki, Ford, and Kaylor for the reasons discussed above.

As a general matter, a law officer may incur § 1983 liability only through affirmative misconduct. *See generally Parratt v. Taylor*, 451 U.S. 527, 535-36 (1981), *overruled on other grounds* by *Daniels v. Williams*, 474 U.S. 327, 106 (1986). "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by others officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2nd Cir. 1998) (citing *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) (excessive force); *Webb v. Hiykel*, 713 F.2d 405, 408 (8th Cir. 1983) (excessive force); *Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir. 1982) (false arrest); *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982), *cert. denied*, 459 U.S. 1171 (1983) (excessive force); *Byrd v. Brishke*, 466 F.2d 6, 10-11 (7th Cir. 1972) (excessive force); *Skorupski v. County of Suffolk*, 652 F. Supp. 690, 694 (E.D.N.Y. 1987) (excessive force)). In *O'neill*, the Second Circuit held that the officer was not obligated to intercede when he did not have a "realistic opportunity to attempt to prevent" the harm. *Id*.

The Fourth Circuit has followed the Second Circuit in *O'neill* by holding that, "if a bystanding officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an

accomplice and treated accordingly." *Randall v. Prince George's County, Md.*, 302 F.3d 188 (9th Cir. 2002) (citing *O'Neill*, 839 F.2d at 11-12 (observing that officer who stands by and does not seek to assist victim could be "tacit collaborator")).

Based on the foregoing, the opportunity to intercede requires that the opportunity be realistic but also that the officer must be present and able to intervene. *See O'neill*, 839 F.2d at 12 (blows to plaintiff were so rapid that it was unrealistic for the other officers to have intervened)*; see also Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982) (no § 1983 liability for failing to intervene when the officer is not present during the acts giving rise to the harm caused).

Here, it is uncontroverted that Officer Sasaki was not present when Cliff contacted Fallis; therefore he is not subject to § 1983 liability for failing to intervene. Although Officers Kaylor and Ford participated in the track, Fallis has provided no evidence that it was realistic for either of these officers to intervene. Unlike Officer Hardesty, neither Officer Ford nor Officer Kaylor had K-9 training; neither the SPD nor BLPD have a K-9 unit. In fact, Officer Ford testified that this was his first K-9 experience. Moreover, the Court will not impute knowledge of handling, controlling, or commanding a trained dog like Cliff in this type of situation; such knowledge rests with trained officers like Officer Hardesty. In short, Fallis has not adequately shown that Officers Kaylor, Ford, or Sasaki had a duty to intervene in an effort to prevent any constitutional violation that may have occurred as a result of Cliff contacting him.

Therefore, the Court grants summary judgment in favor of Defendants on this issue.

**G**.    **Defendants' Motion for Summary Judgment, State Law Claims**

The Court reserves ruling on Defendants' motion for summary judgment as to Fallis' state law claims until it is determined whether any federal claims remain, which will become clear as the parties file, and the Court has occasion to resolve, the anticipated summary judgment motions.

**H.    Officer Sasaki's Motion for Protective Order**

Officer Saski's motion for protective order to prevent the taking of his deposition by Fallis is predicated on waiting until the Court "rules on the pending [motion for summary judgment]" to determine his immunity from suit. Dkt. 39 at 2.

Because the Court has made such a determination herein, the motion for protective order is denied as moot.

**I.    Conclusion**

This order expresses no opinion as to whether Officer Hardesty or the municipalities are subject to Fallis' federal excessive force claim under § 1983, nor does this order express any opinion as to Fallis' claims for supervisory liability.

The Court has granted summary judgment herein as to each individual officer with respect to Fallis' § 1983 probable cause and excessive force claims.

**IV. ORDER**

Therefore, it is hereby **ORDERED** that

1.    Defendants' motion for summary judgment (Dkt. 20) is **GRANTED in part** and **RESERVED in part** as discussed herein;

2.    Officer Hardesty's motion for partial summary judgment and to join the co-Defendants' motion for summary judgment (Dkt. 31) is **GRANTED in part** and **RESERVED in part** as discussed herein; and

1      3.     Officer Sasaki's motion for protective order (Dkt. 39) is **DENIED as**

2  **moot** for the reasons discussed herein.

3      DATED this 13th day of January, 2011.

BENJAMIN H. SETTLE
United States District Judge

ORDER - 24